# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# HARRISONBURG DIVISION

| | |
|---|---|
| **JAMES D. FLICKINGER**, ET AL., | ) |
| Plaintiffs, | ) Case No. 5:05CV00045 |
| v. | ) **OPINION** |
| **E.I. DU PONT DE NEMOURS AND COMPANY,** | ) By: James P. Jones<br>) Chief United States District Judge |
| Defendant. | ) |

*Richard W. Gibson and Jonathan G. Axelrod, Beins, Axelrod, Gleason & Gibson, P.C., Washington, D.C., for Plaintiffs; W. Carter Younger, James P. McElligott, and Meghan M. Cloud, McGuireWoods LLP, Richmond, Virginia, for Defendant.*

In this case former employees of the defendant E.I. du Pont de Nemours and Company ("DuPont"), claim that DuPont's sale of its textile manufacturing business interfered with their federally-protected retirement benefits and discriminated against them on account of age. Based on the summary judgment record, I find that DuPont is entitled to judgment in its favor.

I

This action was brought by sixty-nine individual plaintiffs and their collective bargaining agent, United Workers, Inc. (the "Union") under § 510 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1140 (West 1999), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621-634 (West 1999 & Supp. 2006). Following discovery, the parties filed cross motions for summary judgment. The issue under the plaintiffs' ERISA claim (Count 1 of the Complaint) is whether DuPont structured the sale with the specific intent to interfere with benefits protected under § 510. The issue under the ADEA claim (Count 2) is whether the plaintiffs were discriminated against on account of age with respect to these benefits. The motions for summary judgment have been fully briefed and argued and are ripe for decision.

The facts as shown by the summary judgment record are as follows.

The individual plaintiffs were all employed at DuPont's Waynesboro, Virginia, textile manufacturing plant and were between the ages of forty-five and fifty at the time of the sale. DuPont's plant in Waynesboro was part of an unincorporated division of DuPont that operated under the name INVISTA. INVISTA had nearly fifty plants globally and employed 18,000 employees in approximately thirty different countries.

In the summer of 2002, Koch Industries, Inc ("Koch") expressed interest in purchasing INVISTA from DuPont. In December of 2002, Koch made a written

proposal for the purchase of INVISTA subject to further negotiation and a written purchase agreement.[1]

During negotiations, Koch agreed it would hire nearly all INVISTA employees, including all of the plaintiffs.[2] The only employees Koch declined to hire were a group of highly compensated senior executives. There is no evidence that DuPont and Koch agreed that Koch would hire more employees than it needed and then lay them off once it took over operation of INVISTA facilities. Both Koch and DuPont indicated a desire that all INVISTA employees be retained by Koch.

In the initial stages of the negotiation process, DuPont attempted to ascertain the types of benefits its employees would receive from Koch if the sale of INVISTA occurred. The goal was to obtain comparable benefits for INVISTA employees once they became employed by Koch. At first, Koch was only willing to incorporate the INVISTA employees into the existing Koch system where the level of benefits, although good, was not on par with those provided by DuPont. Although Koch resisted DuPont's suggestion that INVISTA employees receive different benefits

---

[1] The sale of the business was actually to a subsidiary of Koch, but for simplicity's sake, the purchaser will be referred to as Koch.

[2] Although all plaintiffs were subsequently hired by Koch after it purchased INVISTA from DuPont, ten volunteered to be laid off and received severance payments between $35,000 to $48,000. Only one plaintiff was laid off involuntarily. The remaining plaintiffs remain employed by Koch at the Waynesboro plant.

-3-

from those provided to other Koch employees, Koch never disputed the idea that it would hire all INVISTA employees.

Tom Brady, DuPont's human resource manager for mergers and acquisitions, was responsible for evaluating the level of benefits Koch would be providing to the INVISTA employees should a sale occur. In comparison with DuPont benefits, Brady concluded that Koch's benefits were less generous because there was a substantial discounting of benefits for employees retiring before the age of sixty-five, Koch's retiree healthcare was unsubsidized, Koch offered one less week of vacation per year, and Koch lacked a formal severance program to protect employees from downsizing.

In time, Koch acquiesced to Dupont's demands that the INVISTA employees receive more generous benefits than other Koch employees.[3] The cost of the enhanced benefits totaled nearly $185 million and the cost of the post-retirement healthcare subsidy was $20 to $30 million. In response to the enhanced benefits,

---

[3] The additional benefits DuPont secured for the INVISTA employees included: (1) lowering the age of an unreduced pension from sixty-five to sixty-two; (2) giving INVISTA employees a pension "wraparound" where service to DuPont would be applied to the Koch pension plan; (3) providing a three-year retirement healthcare subsidy for INVISTA employees who were at least forty years old with fifteen or more years of service on the date of the sale; (4) offering six weeks of vacation to INVISTA employees who had earned such vacation time as of the date of the closing; and (5) implementing a formal severance program for INVISTA employees. The 2004 Koch /INVISTA Severance Plan provided one month of compensation for every two years of service, with a maximum benefit of twelve months of compensation and a minimum of two months of compensation.

-4-

Brady recommended that DuPont be willing to take a $210 million reduction in the INVISTA purchase price to ensure the benefits transition package would indeed be offered to INVISTA employees at the closing of the sale. DuPont agreed to this reduction in the purchase price in exchange for the enhanced employee benefits. Koch agreed and the changes were incorporated into the Purchase Agreement that was eventually signed by the parties on November 16, 2003. The initial purchase price for DuPont's INVISTA operation was set at $4.4 billion, though it was eventually reduced.[4]

One component of the DuPont pension plan was known as an Optional Retirement Pension ("ORP") benefit. Unlike DuPont, Koch did not offer an ORP benefit. This benefit allowed an early retirement pension to employees who were involuntarily terminated due to a lack of work, after reaching age forty-five with twenty-five years of service.[5] The ORP is the only pension benefit that can be

---

[4] In March of 2004, Koch requested the purchase price outlined in the November 16, 2003 purchase agreement be reduced by $1 billion. DuPont eventually agreed to a $200 million price reduction. This reduction was related to unfavorable financial reports Koch received regarding INVISTA.

[5] The DuPont pension plan provided three circumstances where the ORP benefit would be unavailable:

> (1) the employee is offered and accepts employment with the buyer or joint venturer at the site in conjunction with a sales agreement between the Company and a buyer of company assets or in conjunction with the formation of a joint venture; or (2) the employee is offered and refuses employment with the buyer or joint venture at the site

received before age fifty by a DuPont employee. Employees who retire with the ORP benefit receive more favorable treatment in the calculation of their monthly benefit than would otherwise be allowed under DuPont's pension plan.

Union president Mike Flickinger testified that on February 9, 2004, Koch representative Joseph Coco visited the plant and explained that Koch was looking to cut costs after its takeover of the plant and that the Union should expect layoffs in the future. Coco indicated that performance rather than seniority would be the basis upon which layoffs would be made.

From February 11, 2004, through February 13, 2004, plant employees were given the Koch benefits packet, which outlined the terms and conditions of employment, and a copy of Koch's benefit plans. The employees were also given employment offer letters that included terms of Koch's offer and provided that they had to enroll for employee benefits by March 5, 2004. The deadline for accepting the offer of employment with Koch was set for February 27, 2004.

---

in conjunction with a sales agreement between the Company and a buyer of Company assets or in conjunction with the formation of a joint venture unless the offer is less than 80% of the employee's Company wage or salary level or the rejection results in a job for another employee who would otherwise have been terminated for lack of work; or (3) the employee is transferred to or employed by a wholly-owned subsidiary of the Company, or is transferred to or employed by a subsidiary of the Company or a joint venture in which the Company participates that recognized Company services.

(DuPont Pension & Retirement Plan, Pls.' Summ. J. Ex.1.)

Beginning on February 11, 2004, and continuing through February 13, 2004, employees were also divided into groups based on their retirement eligibility and were given presentations on both their existing benefits with DuPont and the benefits they would receive with Koch. Employees were specifically advised of the benefits for early retirement at Koch. They were told early retirement was only available at age fifty-five, at the earliest, with ten years of service. The presentations made clear there would be no ORP or comparable benefit for workers between the ages of forty-five and fifty.

By February 25, 2004, the Union became concerned that Koch was going to lay off a significant number of former DuPont employees causing those between the ages of forty-five and fifty to lose the ORP benefit. On this date, Flickinger wrote the chairman and CEO of DuPont, Charles Holliday, expressing his concern regarding the impact of the sale on employees between the ages of forty-five and fifty.[6] On March 3, 2004, Flickinger received a reply to the February 25, 2004 letter signed by the Waynesboro plant manager, Mike Laczynski. The letter clearly indicated the

---

[6] Flickinger asserted that a forty-nine-year-old employee with twenty-six years of service who was laid off by Koch after the sale would receive nearly $41,000 less by age sixty-two under the Koch/Dupont "wraparound" pension plan than an employee laid off by DuPont prior to the sale or a fifty-year old with twenty-five years of service hired by Koch.

-7-

ORP only applied in a no-work situation and was inoperative in a divestiture where employees receive offers to continue employment with a subsequent owner.

The INVISTA transaction closed on April 30, 2004. By May 1, 2004, Koch had started operating the Waynesboro plant and all other INVISTA facilities. Koch sought to reduce operating costs of INVISTA by $350 million. The Waynesboro plant's portion was $38 million, to be achieved over a three-year period.

Koch determined the plant's workforce needed to be reduced by fifteen percent, which translated into over 100 workers. Koch and the Union negotiated an agreement on how layoffs were to proceed. Employees would be laid off based on discipline problems and then on job performance. If additional cuts were needed to be made, volunteers would be solicited. In the absence of enough volunteers, the seniority of the employees would be the basis of additional layoffs. Workers selected for layoff were required to sign releases of all claims against INVISTA, its predecessors, and successors in order to receive severance payments. However, at the Union's insistence, many release forms provided that claims against DuPont were not included in the release.

On November 17, 2004, Koch announced that 103 employees had volunteered for layoffs and would be notified of their release dates.[7] However, more employees wanted to resign and receive the severance package than Koch needed to lay off. An additional ninety-seven employees were laid off through March 21, 2006.

On January 24, 2005, Flickinger faxed a letter to the Equal Employment Opportunity Commission, charging that he and others at the Waynesboro plant had been discriminated against by DuPont because they were between the ages of forty-five and fifty and lost the potential to receive the ORP once INVISTA was sold to Koch. The letter was mailed to the EEOC on January 28, 2005. On March 31, 2005, the EEOC issued a Notice of Right to Sue. This suit followed on June 30, 2005.

II

Summary judgment is appropriate when there is "no genuine issue of material fact," given the parties' burden of proof at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see* Fed. R. Civ. P. 56(c). In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable

---

[7] Only one plaintiff, Cynthia Sweet, was laid off without volunteering. However, Sweet signed a settlement agreement and release in exchange for the severance payment. A total of seven plaintiffs were part of the first 103 laid off by Koch.

to the non-moving party. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

Rule 56 (c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

Although the moving party must provide more than a conclusory statement that there are no genuine issues of material fact to support a motion for summary judgment, it "need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994) (quotation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

Applying these principles to the facts presented by the parties, the defendant's motion for summary judgment must be granted as to both causes of action.

-10-

A.  THE ADEA CLAIM.

The undisputed facts show that no later than February 13, 2004, all the plaintiffs had actual or at the least constructive notice that no ORP benefit would be offered by Koch after its takeover of INVISTA. The letter charging DuPont with discrimination was not sent to the EEOC until January of 2005.

Under the ADEA, a plaintiff must exhaust all federal and state administrative remedies before filing suit. *See* 42 U.S.C.A. 2000e-5(c)(West 2003); *Puryear v. County of Roanoke*, 214 F.3d. 514, 517 (4th Cir. 2000) ("[I]n a state that has such a deferral agency, i.e., a 'deferral state,' such as the Commonwealth of Virginia, Title VII requires exhaustion of state and federal administrative remedies prior to a judicial remedy being sought.");*see also EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 123-24 (1988) (finding that the "filing provisions of the ADEA and Title VII are 'virtually *in haec verba*,' the former having been patterned after the latter.").

An aggrieved person may only sue for unlawful employment practices after a charge has been filed in"writing [and] under oath or affirmation" with the EEOC.§ 2000e-5(b). Once a charge has been properly filed with the EEOC, the aggrieved party may initiate a civil action based on claims presented to the EEOC only after receipt of a right-to-sue letter. *See* § 2000e-5(f)(1). Because Virginia is classified as a "deferral state," the period for filing with the EEOC is extended to 300 days. *See*

29 U.S.C.A. § 626 (d)(2) (West 1999). The filing period for an ADEA claim is tantamount to a statute of limitations and claims may be time-barred when not filed within the applicable time period. *See English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987).

The limitations period begins to run when the allegedly discriminatory employment decision is made by the employer and communicated to the employee. *See Del. State Coll. v. Ricks*, 449 U.S. 250, 259 (1980). The focus for calculating the limitations period is not when the ultimate firing, demotion, or other discriminatory act actually occurs, but when the employee receives notice that such action will be taken by the employer at some point in the future. *Id*. at 258; *see also Price* v. *Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982) ("[T]he filing period runs from the time at which the employee is informed of the allegedly discriminatory employment decision, regardless of when the effects of that decision come to fruition.").

In this case, the earliest communication the plaintiffs had with the EEOC was on January 24, 2005. Assuming, without deciding, that this communication constituted a valid charge of discrimination under § 2000e-5(b) and the applicable regulations, it was untimely because more than 300 days had elapsed since the plaintiffs received notice of the allegedly discriminatory employment decision.

It is undisputed that all plaintiffs had received notice by February 13, 2004, that the ORP benefit provided by DuPont would not be available once the INVISTA operation was taken over by Koch.[8] The plaintiffs argue the limitations period did not begin to run until April 8, 2004, the date they believe the Purchase Agreement became irrevocable. The November 16, 2003 Purchase Agreement conclusively demonstrates the parties' belief that INVISTA would be purchased by Koch subject only to regulatory approval and customary closing conditions. Therefore, the agreement encompassed more than a mere tentative understanding. It also clearly showed that Koch had no plans to offer the ORP benefit and that DuPont would not be providing the value of that benefit for qualifying employees accepting offers from Koch. When this information was specifically communicated to INVISTA employees in February 2004, it was all but certain Koch would be the ultimate purchaser. Although there were subsequent amendments to the November 16, 2003 Purchase Agreement, it operated as the underlying, definitive agreement upon which the sale and closing were based. The limitations period was triggered when the employees

---

[8] Even if the plaintiffs had filed a timely charge of discrimination with the EEOC, for the reasons stated below they have failed to make a prima facie showing of discrimination or to establish the defendant's non-discriminatory justifications for the action as merely pretext or untrue.

-13-

were advised there would be no ORP benefit. As such, the plaintiffs' ADEA claim is untimely and summary judgment will be granted for the defendant on count 1.

B. THE ERISA CLAIM.

The plaintiffs seek damages under § 510 of ERISA, on the ground that DuPont structured the sale of INVISTA in such a manner as to deny them the ability to attain the ORP benefit for which they were eligible. In essence, the plaintiffs assert that DuPont has violated § 510 by either failing to terminate them prior to the sale so they could collect the ORP benefit or by not ensuring a similar benefit would be provided for them by Koch.[9]

Section 510 makes it unlawful for any person to "discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purposes of interfering with the

---

[9] The plaintiff Carl Howell's ERISA claim is barred because he filed his suit outside the applicable two-year statute of limitations for § 510 claims. *See Sutter* v. *First Union Nat'l Bank of Va., Inc.*, 932 F. Supp. 753, 757 (E.D. Va. 1996) (applying Virginia's catch-all statute of limitations provision, Va. Code Ann. § 8.01-248 (Michie 2000), because Virginia's common law cause of action for wrongful discharge is most analogous to an action under § 510 of ERISA). As the record indicates, Howell received notice by February 13, 2004, that he would not receive the ORP if he continued his employment with Koch. Accordingly, his claim is barred because he did not join the suit until April 11, 2006.

-14-

attainment of any right to which such participant may become entitled under the plan . . . ." 29 U.S.C.A. § 1140.

In order to prevail in a § 510 action, the plaintiffs must demonstrate the employer's specific intent to interfere with their pension rights. *See Conkwright v.Westinghouse Elec. Corp.*, 933 F.2d 231, 238 (4th Cir. 1991). In other words, the plaintiffs must adduce facts, if taken as true, that show the employer's conduct was motivated by a specific intent to violate § 510. *See Buko v. Am. Med. Labs.*, *Inc.*, 830 F. Supp. 899, 905 (E.D. Va. 1993). "[I]t is not sufficient for an employee to allege lost opportunity . . . as evidence of the employer's specific intent to violate ERISA." *Conkwright,* 933 F.2d at 239. The plaintiffs have the burden to point to specific facts that could allow the jury to decide the employer was improperly motivated when making the challenged employment decision. There is no ERISA violation where loss of benefits is merely incidental to the transaction at issue. "In order to sustain a Section 510 claim . . . the plaintiff must show more than an incidental loss of benefits resulting from the termination, and more than the 'lost opportunity' to accrue additional benefits." *Buko*, 830 F. Supp. at 906. A § 510 claim must fail without proof of specific discriminatory intent. *See Conkwright,* 933 F.2d at 238.

The plaintiffs have failed to show that DuPont's sale of INVISTA was done with the intent to deprive them of the ORP benefit. The plaintiffs claim that DuPont's

-15-

rejection of the Union's request to preserve the ORP benefit after the sale to Koch constitutes specific intent to interfere with pension benefits. However, mere awareness of a result cannot be equated with specific intent that such a result occur. The loss of this benefit, without more, is insufficient to demonstrate the requisite intent to allow this case to proceed. This loss, which the plaintiffs value at $8 million for all INVISTA workers between the ages of forty-five and fifty, was merely incidental in a nearly $4 billion transaction.

The plaintiffs argument that they were discriminated against because they were not terminated prior to the sale strains logic and does not comport with the purpose of ERISA. The primary purpose of § 510 of ERISA is to "prevent[] unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980).

It is clear that DuPont agreed to a substantial reduction in the purchase price in order to win concessions from Koch that would provide a level of benefits more comparable to DuPont's. The undisputed facts reveal that DuPont structured this multi-billion dollar transaction in a manner that was intended to protect INVISTA workers. DuPont reduced its asking price by nearly $200 million in order to secure additional benefits for INVISTA employees that other Koch employees did not receive. If the underlying purpose of this transaction was to deprive INVISTA

-16-

workers of the ORP benefit in order to save money, it defies logic that DuPont would demand enhanced benefits be provided for all INVISTA employees at a cost of several million dollars. In light of DuPont's aggressive negotiations with Koch to secure additional benefits for INVISTA employees, there are simply no facts to support the assertion that DuPont structured this transaction in a manner to violate § 510. Nothing in the record suggests DuPont undertook the sale of INVISTA because it specifically wanted to interfere with certain employees attaining the ORP benefit.

Furthermore, the majority of the plaintiffs continue to work for Koch and were not laid off after the take-over of the Waynesboro facility. The ORP benefit only became operative where the DuPont employee was laid off due to a lack of work. This benefit acted as a safety net allowing a worker to draw some income after devoting twenty-five years or more of service to DuPont. Although the ORP benefit is no longer available to an INVISTA employee who is laid off due to a lack of work, the fact that many of the plaintiffs were not targeted for layoff cuts against the plaintiffs' claim of a § 510 violation. To date, nearly every employee laid off by Koch has volunteered. DuPont clearly provided in the terms of its pension plan that the ORP benefit would become inoperable where the employee was offered and accepted employment with a buyer or where the employee was offered but refused employment with the buyer.

-17-

Case 5:05-cv-00045-JPJ   Document 54   Filed 12/13/06   Page 17 of 20   Pageid#: 588

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), created a three-stage proof scheme in Title VII cases. The Fourth Circuit has applied the *McDonnell Douglas* scheme of presumptions and shifting burdens applicable in Title VII cases to claims brought under § 510 of ERISA. *See Conkwright,* 933 F.2d at 238. The plaintiff must first establish a prima facie case of discriminatory action. *EEOC v. Western Elec. Co.,* 713 F.2d 1011, 1014 (4th Cir. 1983). Where a prima facie case is established, a rebuttable presumption of unlawful discrimination is created. *Id.* The defendant may rebut the presumption by articulating some legitimate non-discriminatory reason for the challenged action. *Id.* Where such a reason is presented, the plaintiff bears the burden of demonstrating that the proffered reason was pretextual or untrue.

Even assuming the plaintiffs have established a prima facie case of improper discrimination, the defendant has advanced a legitimate, non-discriminatory reason for the elimination of the ORP benefit. Under the *McDonnell Douglas* scheme of proof, the plaintiffs' claim fails because they do not demonstrate a genuine issue of pretext. *Conkwright*, 933 F.2d at 239. The defendant claims the transaction was structured to enable Koch to retain the knowledge and expertise of the INVISTA employees, and to enable DuPont to provide job security for those same employees. The only other evidence the plaintiffs have to prove the defendant's proffered reasons

-18-

for the transaction as mere pretext is the savings DuPont achieved because the ORP benefit was not preserved. The fact an employer has saved money, standing alone, does not demonstrate pretext. *Id.* at 237.

Summary judgment is proper in this case because the plaintiffs have failed to meet their burden of presenting facts that could show that the defendant's justification for the elimination of the ORP benefit was merely pretext.

Here, the facts show that during negotiations over the sale of the facility both DuPont and Koch wanted all INVISTA employees to be retained after the closing of the sale. Other than bald assertions, the plaintiffs point to no evidence that controverts this conclusion.[10] Because the plaintiffs have failed to meet their necessary burden of proof, the defendant's motion for summary judgment will be granted as to Count 2.

---

[10] The plaintiffs concede that "Koch may never have discussed with Dupont [sic] that it would hire more employees than needed and then lay them off." (Pls.' Mem. Opp. to Mot. Summ. J. 4.) However, they contend "everyone certainly knew what Koch was getting: Koch would hire everyone, but only temporarily." (*Id.* 5.) This assertion, without more, is insufficient to create a question of whether the justification advanced by the defendant is merely pretext.

III

For the foregoing reasons, I will deny the plaintiffs' motion for summary judgment and grant the defendant's motion for summary judgment.

An appropriate final judgment will be entered.

                                                               DATED: December 13, 2006

                                                               /s/ JAMES P. JONES
                                                               Chief United States District Judge